## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABIGAIL CARMICHAEL JORDAN**, <br><br> Plaintiff, <br><br> v. <br><br> **MARCO RUBIO**, *in his official capacity as Secretary of State, et al.*, <br><br> Defendants. | Case No. 1:24-cv-01844 (TNM) |

## MEMORANDUM OPINION

Abigail Jordan has been trying to get a passport since 2019. The problem? A passport application requires either a birth certificate or a letter confirming that an applicant lacks one. And it is Jordan's sincerely held conviction that obtaining either form of documentation would endanger her religious scruples.

The predicament has left Jordan dismayed. She feels called to evangelize worldwide— but does not want to sully her other beliefs to do so. Seeking resolution, she sued the Department of State and Secretary of State (collectively, the "Department"), asking the Court to declare she is a U.S. citizen and order the issuance of a passport.

Jordan originally filed *pro se*, and the circumstances on the ground remained stagnant. But once the Court approved Jordan's request for counsel, the Department's whistling took on a different tune. State and federal officials suddenly cooperated to attain the proper documentation for Jordan in a manner that did not violate her religious beliefs. And the Department represented that it stood ready to issue Jordan a passport—so long as she filled out yet another passport application and submitted yet another photograph. Now, the Department insists the case is moot.

Not so.  Jordan continues to suffer consequences from the Department's years-long refusal to issue her a passport.  So much is obvious:  She still lacks a passport.  The Court thus delves into the merits of Jordan's claims and finds that she is entitled to summary judgment on them.  As for Jordan's religious freedom claim, the Department imposed a substantial burden on her religious exercise when it demanded she obtain documents through a process that violated her religious beliefs.  But the Department has not presented a compelling justification to require Jordan to go through such a process.  Nor has it demonstrated that the process was the least restrictive means of achieving its national security interests.  So on that score, the Court will grant summary judgment to Jordan.

More, Jordan merits summary judgment on her claim under 8 U.S.C. § 1503.  She has made an unrebutted prima facie case that she is a national of the United States entitled to a passport.  This adequate remedy moots her claims under the APA and the Mandamus Act.

## I.

All her life, Abigail Carmichael Jordan has avoided the perceived stain of a Social Security Number ("SSN").  Am. Compl., ECF No. 24, ¶ 3.  Her devout Christian faith teaches her "that her God-given identity is sacred, and that the allegiance she owes to her government as a citizen of the United States must be subordinate to her allegiance to her Creator."  *Id.*  She thus rejects the possibility of being "enumerated" or "marked" by the government, such as by obtaining an SSN, as to do so "would be treating the Government as if it were God."  Am. Compl. ¶¶ 32–33 (citing Revelation 13:16–18).  Her parents share this belief.  *Id.*  Indeed, her parents "did everything in their power to ensure that [she] did not receive a birth certificate when she was born, including withholding her first name from hospital officials," for fear that applying for a birth certificate would result in the issuance of an SSN.  Am. Compl. ¶ 3.

At the same time, Jordan's faith calls her to "make disciples of all nations." Am. Compl. ¶ 39 (quoting Matthew 28:19–20). To carry out this mission, Jordan has been seeking a passport for six years. *Id.*

First, in 2019, Jordan applied for a passport and attached a sworn letter explaining that she lacked an SSN for religious reasons, and that she did not have a birth certificate for fear she could be assigned an SSN if she applied for one. Am. Compl. ¶ 40. To bolster her U.S. citizenship bonafides in the absence of a birth certificate, Jordan attached several records, including a sworn declaration from her father; a certificate of her childhood baptism; and a childhood immunization record, among others. Am. Compl. ¶ 41. This was not enough for the Department. Am. Compl. ¶ 42. Most relevantly, the Department stressed that Jordan failed to supply "[a] statement from the appropriate state registrar of records certifying that there is no birth record on file" for her. *Id.* That is, the Department needed a so-called "Letter of No Record" from Jordan to issue the passport without a birth certificate. *See* Peek Decl., ECF No. 42-3, ¶ 9.

A Letter of No Record ("Letter") is "documentary evidence that is necessary to confirm a first-time applicant's claim of non-existence of a U.S. birth record, which is essential in examining the purported citizenship claim of a first-time applicant." Peek Decl. ¶ 10. According to the Department, the requirement that a passport applicant without a birth certificate obtain a Letter of No Record "is critical in preventing not only identity theft and fraud but is essential in upholding the integrity of a U.S. passport." *Id.* One of the most common types of passport fraud includes using fake birth certificates or stolen identities when applying for passports; the Letter of No Record is a safety precaution to ensure that someone is who she says she is. Peek Decl. ¶ 11.

Aiming to comply, Jordan visited Virginia's Office of Vital Records to request a Letter of No Record.  Am. Compl. ¶ 43.  But the Office informed Jordan that she could not obtain one unless she filled out a form entitled "Birth Certificate Information," which asked for her "name at birth, date of birth, place of birth, hospital of birth, race, sex, and parents' names."  *Id*.; Jordan Decl. ¶ 27.  Jordan was fearful that the submission of such information "could be construed as a request for a birth certificate . . . or could otherwise cause the Office to create a stand-in record for her containing that same information, which could then be passed along to the Social Security Administration for issuance of an SSN."  Am. Compl. ¶ 44.  So Jordan refused to fill out the form and did not receive a Letter of No Record.  Am. Compl. ¶ 45.  Her passport application was accordingly denied by the Department.  Am. Compl. ¶ 46.  She appealed that denial but never received a response.  Am. Compl. ¶ 47.

Three years later, Jordan again sought a passport.  Am. Compl. ¶ 48.  She explained to the Department why she could not obtain a Letter of No Record consistent with her religious beliefs.  Am. Compl. ¶ 50.  And she submitted more evidence of her U.S. citizenship.  Am. Compl. ¶ 51.  But again, her application was denied because she had not submitted the Letter. Am. Compl. ¶ 52–59.

Jordan then brought this suit.  Compl., ECF No. 1, at 1.  She originally proceeded *pro se*. *Id.*  Upon Jordan's motion, the Court appointed counsel[1] and set a briefing schedule.  *See* Min. Orders 12/18/2024 and 1/21/2025.  Jordan's Amended Complaint brings nine counts against the Department and several Virginia officials ("Virginia Defendants").  Am. Compl. at 1.  Broadly, it argues the Department and Virginia Defendants infringed her right to religious freedom and violated the Administrative Procedure Act ("APA").  Am. Compl. ¶¶ 112–44.  And it seeks

---

[1]  The Court acknowledges the thoughtful and zealous advocacy of Jordan's pro bono counsel.

various forms of relief, including "[a] permanent injunction ordering the [Department] to issue a passport to Mrs. Jordan, or to provide her with an appropriate religious accommodation," "[a] declaration that Mrs. Jordan is a U.S. citizen and is entitled to a passport," and a "writ of mandamus." Am. Compl. ¶¶ 138, 145.

While this suit was pending, Jordan contacted Virginia's Office of Vital Records to request a Letter of No Record again. Am. Compl. ¶ 60. The Deputy Director informed Jordan that the Office would not issue a Letter of No Record because the Office located a birth certificate on file with the name "Baby Girl Carmichael." Am. Compl. ¶ 64. This tracked with an ancestry.com search that revealed a similar certificate, which the parties learned about during this litigation. *See* Admin. R., ECF No. 42-2, at AR010. While it is unclear how this partial birth certificate was created, Jordan has her suspicions. When she was born, health care providers ignored her parents' pleas to avoid "collect[ing] DNA or any information" from Jordan "that could then be transmitted to the SSA under the Enumeration at Birth program," the way newborns obtain an SSN. Am. Compl. ¶ 36. Healthcare providers "dishonored that request when [they] removed Mrs. Jordan from her hospital room in the middle of the night . . . and drew blood to record [her] DNA." *Id*. These same providers "also initially stated that Mrs. Jordan could not be taken home until [her parents] provided her name for birth records," but ultimately relented. *Id*. Still, this sequence of events likely resulted in the creation of a partial birth record for Jordan, which she never knew existed until now.

Meanwhile, the Department and Virginia Defendants cooperated behind the scenes. In February 2025, they broke major news to Jordan and the Court. The Virginia Office of Vital Records decided to forward the Letter of No Record to the Department, obviating the need for Jordan to fill out any offending form. Dep.'s Reply to Pl.'s Stmt. Material Facts, ECF No. 42-6,

¶ 99.  Jordan then voluntarily dismissed her claims against the Virginia Defendants with prejudice.  Not. Voluntary Dismissal, ECF No. 36.

As the deadline for Jordan's summary judgment motion loomed, the Department informed Jordan that the Letter of No Record satisfied the documentary requirements for a passport.  Dep.'s Reply to Pl.'s Stmt. Material Facts ¶ 100.  So it told Jordan that it would issue her a passport if she submitted a new application and current photograph.  Dep.'s Reply to Pl.'s Stmt. Material Facts ¶ 101.  It also agreed to expedite her passport application and assigned her a person of contact to facilitate the process.  *Id.*; *see also* Dep.'s Mot. Summ. J., ECF No. 42, at 10.

But Jordan remains unsatisfied.  She has refused these offers, arguing that there "is no sound reason" why she should have to fill out another application to receive her passport.  Pl.'s Reply Br., ECF No. 43, at 35.  She also fears that this situation could repeat itself upon her inevitable passport renewal in a decade.  Pl.'s Reply Br. at 38–40.  More, she notes that the Department could revoke her passport at any time and require her to submit a new Letter.  *Id.* She sought a judicially enforceable consent decree from the Department, offering to terminate the litigation if the Department signed on, but the Department rebuffed that request.  *Id.* at 43.

So Jordan proceeded to move for summary judgment against the Department, filing the present motion.  The Department responds with its own motion to dismiss or, in the alternative, cross-motion for summary judgment, contending that the case is moot and that, if not moot, Jordan's assertions founder on the merits.  The Court held a motions hearing and is now set to rule on the cross-motions.

6

## II.

If a suit is not a "Case" or "Controversy" under Article III, the Court lacks jurisdiction to hear it. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971). So when a party moves to dismiss for lack of case or controversy—such as by claiming the dispute is moot—the Court evaluates that claim under Federal Rule of Civil Procedure 12(b)(1). *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 441 (D.C. Cir. 2020). "While the Court will accept factual allegations in the complaint as true, those allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Nepal v. U.S. Dep't of State*, 602 F. Supp. 3d 115, 123 (D.D.C. 2022) (cleaned up). And the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

While usually it is up to a plaintiff to show that the Court has jurisdiction, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), it is on the defendant to establish that a once-live case has turned moot. *West Virginia v. EPA*, 597 U.S. 697, 719 (2022). This is a "formidable burden." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, the Court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up). "This mode of analysis serves to separate the jury functions of making credibility determinations, weighing the evidence, and drawing legitimate inferences from the facts from the district court's role as the arbiter of legal questions." *Id.* (cleaned up). "When parties file cross-motions for summary judgment, each

motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether the Rule 56 standard has been met." *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 74 (D.D.C. 2023), *aff'd sub nom., Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025).

### III.

The Court begins as it must with jurisdiction. And it concludes that the Department has failed to satisfy its burden of showing mootness. The Court thus proceeds to Jordan's substantive claims and concludes that Jordan is entitled to summary judgment on them.

### A.

A case turns moot—and thus falls outside the auspices of Article III—"when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). In other words, the mootness inquiry asks "whether events subsequent to the filing of the complaint have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020). A defendant bears the "heavy burden" of showing that a live controversy has expired. *Id.*

Still, there is a wrinkle in this general rule. If the controversy's expiration stems from the defendant's "voluntary cessation of allegedly illegal conduct," the tribunal is not "deprive[d] . . . of power to hear and determine the case." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979). In other words, a defendant cannot moot out a case by shaping up once it gets sued. Otherwise, the defendant could go back to its old shenanigans once the court got out of the way. This is known as the voluntary cessation exception to mootness.

When a defendant argues a case is moot because it has willingly stopped the challenged conduct, the defendant must make two more showings to prevail. First, it must show that "there is no reasonable expectation that the alleged violation will recur." *Id.* And second, it must show that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.*

The Department has not satisfied this arduous burden.

To begin with, the Court affirms that this case is best understood under the voluntary cessation framework. The Department argued to the contrary at the motions hearing, contending that it is not the *Department* which voluntarily ceased unlawful conduct, but rather the *state* Office of Vital Records. Hr'g Tr. 35:20–23 ("That was an issue between Plaintiff and Virginia. It wasn't -- that wasn't a situation that could be controlled by the Department of State."). The Department, the argument goes, has required a Letter of No Record all along. Now, with the Letter in hand, it is prepared to issue Jordan a passport. According to the Department, it is the *state* Office that suspended the requirement that Jordan provide personally identifiable information in order to obtain a Letter of No Record, by ultimately giving that Letter to the Department of its own volition. Thus any doctrine that contemplates the Department ceasing challenged conduct, the argument proceeds, is inapt here.

The Court sees things differently. Before this lawsuit was filed and counsel was appointed, the Department was adamant that Jordan herself supply the Letter. *See* Admin. R. at AR008, AR014, AR017, AR021, AR048, AR051. Once counsel started clamoring, the Department shifted course, initiating efforts to independently obtain the Letter from Virginia's Office of Vital Records. Dep.'s Mot. Summ. J. at 9 ("After the filing of the amended complaint,

and in an effort to resolve this matter, undersigned counsel certifies to the Court that he worked with the Virginia Defendants to obtain the Letter of No Record.").

Jordan's contemporaneous efforts failed.  Her counsel wrote to Virginia's officials, explaining Jordan's religious objections and "request[ing] that [the] [O]ffice conduct a search of its records and, upon confirming that no birth record exists for Mrs. Jordan, provide her with a Statement of No Record of Birth."  Batista Decl. Exhibits, ECF No. 35-9, at 2–4.  Jordan's counsel stressed that he would "pursue appropriate legal action" if the Letter were not provided within a reasonable time.  *Id.* at 2.  The Office responded weeks later by telephone, informing Jordan's counsel that it was declining to issue the Letter because the Office had located a birth certificate with the name "Baby Girl Carmichael."  Batista Decl., ECF No. 35-8, ¶ 5.  And it stated that it "could not provide Mrs. Jordan with documentation of any kind unless she applie[d] to amend the existing partial birth certificate to add her first name to the certificate."  Batista Decl. ¶ 7.

Though Jordan's own attempts stalled, the Department's prevailed—the Office forwarded the Letter directly to the Department, which then shared it with Jordan and her counsel.  Hr'g Tr. 31:18–19 ("I think they sent the letter first to me…").  Thus, the Department suspended a practice which Jordan objected to—the requirement that *she* obtain and supply a Letter of No Record.  This makes the voluntary cessation doctrine a clean fit.

And the Department has not met its burden to overcome the voluntary cessation exception to mootness.  It starts off well.  The Department has satisfactorily shown that "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth*, 528 U.S. at 190.  The Department's counsel has represented that the Department will keep the Letter of No Record in Jordan's file "so her passport will not be

10

revoked or ineligible for renewal based on the absence of the Letter or a birth certificate."

Dep.'s Reply Br., ECF No. 46, at 24. The Court credits this assertion; it is "settled practice . . .

fully to accept representations such as these" when determining whether official conduct will

recur. *Defunis v. Odegaard*, 416 U.S. 312, 317 (1974); *see also Porup v. CIA*, 997 F.3d 1224,

1232 (D.C. Cir. 2021) (relying on government counsel's representations in court when assessing

voluntary cessation exception). More, only a *first-time* passport applicant must supply either a

birth certificate or Letter of No Record. *See* Dep.'s Mot. Summ. J. at 10 n.5. So even if the

Department were to eliminate the Letter from Jordan's file, and go back on its word, Jordan

would still be eligible for a passport renewal. Put differently, there is no basis to conclude that

Jordan will ever have to obtain a Letter of No Record or a birth certificate again.

      Jordan's arguments to the contrary sound in conjecture. She insists that the Department

could revoke her passport at any time and demand she provide a new Letter or a birth certificate.

*See* Pl.'s Reply Br. at 38–40; Hr'g Tr. 9:2–7 ("I don't think it is a stretch…"). But "such

speculative contingencies" do not show that challenged conduct is likely to recur "in the absence

of evidence that this is a prospect of immediacy and reality." *Defunis*, 416 U.S. at 320 n.5; *see

also Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 350 (D.C. Cir. 1997)

(stressing that plaintiffs' speculative fears were a "wholly inadequate basis" to find a reasonable

chance of recurrence.). In other words, the Department has met its burden to show that "there is

no *reasonable* expectation that the alleged violation will recur." *Nat'l Black Police Ass'n*, 108

F.3d at 349 (emphasis added). Jordan may not rebut this showing with mere speculation.

*Accord Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (plaintiffs could not overcome

government's mootness showing where "[t]he record . . . contain[ed] no . . . evidence" that

plaintiffs' fears of recurrence would materialize). The Department has met its burden on the first element of the voluntary cessation test.

But it falters on the second. Jordan continues to face consequences from the denials of her passport applications. While the Department represents that it stands ready to issue Jordan a passport, it refuses to do so unless Jordan submits an updated application with a new photograph. Peek Decl. ¶¶ 15–16. These extra hurdles constitute "effects of the alleged violation." *Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 725 (D.C. Cir. 2012). Had the Department dispensed with the Letter of No Record requirement and acknowledged Jordan's copious evidence of citizenship off the bat, she would have that passport now. And she would not be forced to exert *more* time, energy, and money to obtain a passport that all agree is rightfully hers.

The Department may think that these are nothing more than *de minimis* administrative burdens. *See* Dep.'s Mot. Summ. J. at 22 (arguing that this case is "not a sound use of counsel's or the Court's time"); Dep.'s Reply Br. at 23 ("The idea that the Department should have to forego other policies . . . does not preclude the case as being moot."). But it does not point to any caselaw that establishes a threshold for when ongoing harms "count," and when they do not.

Further delays and obligations surely suffice. Indeed, in a related vein, the Supreme Court has acknowledged that "a plaintiff's request for nominal damages . . . can keep an otherwise moot case alive." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021) (Kavanaugh, J., concurring). This reflects that even seemingly "small" forms of relief are "concrete" and "effectuate a partial remedy." *Id.* at 291. Thus, the possibility of their issuance can "provide redress" to a plaintiff. *Id.* Similarly, in the standing context, courts have roundly recognized that "the amount" of economic harm is "irrelevant" to the standing inquiry, as "[a] dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854

F.3d 1, 5 (D.C. Cir. 2017).  The Department has not shown the Court why it should depart from these precedents' collective wisdom that so-called "minor" harms, which still invite judicial relief, keep a suit in the land of cases and controversies.

Here, Jordan faces ongoing harms—the Department is making her expend more labor before she can obtain a passport she should have received six years ago.  *Cf. Spann v. Colonia Vill., Inc.*, 899 F.2d 24, 29 (D.C. Cir. 1990) (plaintiffs' "concrete drain on their time and resources" constitutes injury-in-fact.).  Those injuries can be avoided if the Court intervenes.  *See infra*, Part III.C.  Since an "aspect of [Jordan's] injury persists" that "can be relieved by an appropriate court order," this case is not moot.  *Zukerman v. United States Postal Serv.*, 961 F.3d at 443.  The Court therefore turns to the merits of Jordan's claims.

**B.**

Begin with Jordan's allegations under the Religious Freedom Restoration Act ("RFRA"). This statute provides that the "Government shall not substantially burden a person's exercise of religion," unless it "demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling government interest."  42 U.S.C. § 2000bb-1.  Even neutral, generally applicable laws are susceptible to a challenge under RFRA.  *Capitol Hill Baptist Church v. Bowser,* 496 F. Supp. 3d 284, 293 (D.D.C. 2020).

Whether the Department has violated RFRA thus boils down to two phases.  First, the Court asks whether the challenged conduct substantially burdened the plaintiff's religious exercise.  If so, strict scrutiny applies.  For that stage, the Court probes whether the imposition of the burden was in pursuit of a compelling government interest.  And it queries whether the pursuit of that interest required imposing the challenged burden.  This is a "stringent" and

"exceptionally demanding" test. *Burwell v. Hobby Lobby Stores*, Inc., 573 U.S. 682, 696, 728 (2014). Only if the answer to both strict scrutiny questions is yes can the Department justify its behavior.

Start with the substantial burden question. Jordan asserts that the Department imposed a substantial burden on her religious exercise by saddling her with a dilemma—defy her religious convictions or forego a passport. Pl.'s Mot. Summ. J., ECF No. 35, at 23–25. Jordan is correct.

The Department denied Jordan's passport applications because she did not submit a birth certificate or a Letter of No Record. Admin. R. at AR008, AR014, AR017, AR021, AR048, AR051. Jordan's religious convictions, however, prevent her from obtaining a birth certificate, "due to the unacceptable risk that an SSN will be generated for any individual with birth-certificate information on file in Virginia, even when an SSN is not specifically requested." Jordan Decl., ECF No. 35-2, ¶ 10. And they also bar her from acquiring a Letter of No Record, as its application leads Jordan to fear that it "could be construed as an application for a birth certificate containing that information or would cause the Office of Vital Records to generate some other stand-in record containing all the same information that could then be transmitted to SSA for the issuance of an SSN." Jordan Decl. ¶ 27.

In short: The Department withheld a coveted public benefit unless Jordan abandoned the teachings of her faith. Such carrot-dangling is the classic example of a substantial burden on religious exercise. The rule is black-and-white: A person may not be "force[d] . . . to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716–17 (1981) (cleaned up). But here, that is precisely

what Jordan was asked to do.  Passport or salvation.  Thus she has been made to suffer a substantial burden on her religious exercise.

The Department's counterarguments fail to persuade.

First, the Department argues that this case is controlled by the Supreme Court's opinion in *Bowen v. Roy*, 476 U.S. 693 (1986), and derivatively the D.C. Circuit's opinion in *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008).  It is not.  Begin with *Roy*.  There, a father objected to the state's use of his daughter's SSN when doling out welfare benefits.  *Roy*, 476 U.S. at 696, 699.  The Supreme Court held that this gripe could not support a Free Exercise challenge.  *Id.* at 699.  Roy "object[ed] to the statutory requirements that state agencies 'shall utilize' Social Security numbers not because it places any restriction on what he may believe or what he may do, but because the *use* of the number may harm his daughter's spirit."  *Id.* (emphasis added).  But the Court stressed that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."  *Id.*  Cheekily put:  "Roy [could] no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets."  *Id.* at 700.  Because Roy did not object to a forced alteration of his *own behavior* but offered a theological critique of the *government's behavior*, he could not state a Free Exercise claim.

That said, five Justices explained that Roy could not be compelled to *provide* an SSN on his family's welfare application.  Michael W. McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. Chi. L. Rev. 1109, 1127 (1990) (citing *Roy*, 476 U.S. at 712–13 (Blackmun, J., concurring in part), 728 (O'Connor, J., joined by Justices Brennan and Marshall,

concurring in part and dissenting in part), 733 (White, J., dissenting)).  This did not become a holding of the Court because one of the five Justices believed the question was moot.  *Roy*, 476 U.S. at 714 (Blackmun, J., concurring in part).  Still, a majority of the Court saw a clear distinction between a claim based on coerced personal conduct and a claim based on the government's internal procedures.

While Roy's claim fell on the latter side of this gulf, Jordan's is squarely on the former. She protests a mandate on her individual behavior—the requirement that *she* apply for a birth certificate or Letter of No Record and spur the risk of being branded by the government.  Unlike Roy, she is not objecting to the government's internal use of an SSN that has already been created.  *Roy*, 476 U.S. at 700.  She has qualms about her own participation and complicity in the potential issuance of an SSN.

The same conclusion goes for the Department's reliance on *Kaemmerling*.  There, a convicted felon objected to the state's practice of collecting fluid or tissue samples from qualifying offenders to create a law-enforcement DNA database.  *Kaemmerling*, 553 F.3d at 673–74.  Kaemmerling argued that "the collection and retention of his DNA information is tantamount to laying the foundation for the rise of the anti-Christ," which defied his "strongly held religious beliefs about the proper use of the building blocks of life."  *Id.* at 674.  Following *Roy*, the D.C. Circuit held that "Kaemmerling [did] not allege facts sufficient to state a substantial burden on his religious exercise because he cannot identify any 'exercise' which is the subject of the burden to which he objects."  *Id.* at 679.  Kaemmerling did not object to the "[Bureau of Prisons] collecting any bodily specimen that contains DNA material."  *Id.*  Instead, he objected to the government's "extracting DNA information from the specimen."  *Id.*  The Circuit stressed that "[t]he extraction and storage of DNA information are entirely activities of

the FBI, in which Kaemmerling plays no role and which occur after the BOP has taken his fluid or tissue sample (to which he does not object)." *Id.* Thus, like the father in *Roy*, "Kaemmerling's opposition to government collection and storage of his DNA profile does not contend that any act of the government pressures him to change his behavior and violate his religion, but only seeks to require the government itself to conduct its affairs in conformance with his religion." *Id.* at 680. This type of theological critique did not constitute a substantial burden. *Id.*

Again, Jordan's claims are not simply proselytization. Jordan insists that the Department has "put[] substantial pressure on [her] to modify [her] behavior and to violate [her] beliefs" by forcing her to apply for a birth certificate or Letter. *Thomas*, 450 U.S. at 718. Thus *Roy* and *Kaemmerling* do not dictate dismissal here—instead, the dichotomy they set up bolsters Jordan's allegations.

Second, the Department pokes holes in the reasonableness of Jordan's beliefs. It stresses that Jordan's parents could have obtained a birth certificate for her without risking the assignment of an SSN, as the SSA's Enumeration at Birth program is "voluntary." Dep.'s Mot. Summ. J. at 21–22. And it points out that adults face virtually no risk of unwittingly receiving an SSN, as there is no enumeration program for adults whereby an SSN is issued when they request a birth certificate. Dep.'s Mot. Summ. J. at 22. The Department traces the path an adult would have to take to obtain an SSN, which includes "fill[ing] out an application for a Social Security Card," "forward[ing] it with required documentation to the Social Security Administration for review," and potentially "undergo[ing] a personal interview." Dep.'s Mot. Summ. J. at 22–23. Thus according to the Department, Jordan's "fears are unfounded." Dep.'s Mot. Summ. J. at 24.

The Court is disinclined to bicker about the way the system works. It very well may be that Jordan never faced a substantial risk of receiving an unwanted SSN—at birth or during adulthood. But for Jordan's RFRA claim, the actual risk is irrelevant. What matters is whether Jordan sincerely believes that applying for a Letter of No Record conflicted with her faith because it exposed her to the unacceptable possibility that she would be stained with an SSN. And here, there is no dispute that Jordan honestly believes this. *See* Dep.'s Reply to Pl.'s Stmt. of Material Facts ¶¶ 3, 6–20. So the Court must credit her fears—it may not tell Jordan that she is mistaken about the dictates of her own faith. *See* John Locke, *A Letter Concerning Toleration* 7 (1689) ("[T]he care of souls cannot belong to the civil magistrate, because his power consists only in outward force; but true and saving religion consists in the inward persuasion of the mind."); *Memorial and Remonstrance Against Religious Assessments*, 2 Writings of James Madison 183, 184 (G. Hunt ed. 1901) ("The Religion then of every man must be left to conviction and conscience of every man . . . [T]he opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men."). Nor may the Court draw the line on the near occasion of sin. *See* Rev. Francis J. Connell, 3 *The New Confraternity Ed. Rev'd Baltimore Catechism and Mass* 42 Quest. 76 (1949).

This conclusion is compelled by the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). There, the proprietors of closely held corporations objected to a federal policy that required them to provide health insurance to their employees that covered methods of birth control that could destroy an embryo. *Id.* at 690–91. These birth control methods conflicted with the proprietors' beliefs that life begins at conception. *Id.* at 700. The Supreme Court held that the federal law imposed a substantial burden on these plaintiffs. *Id.* at 720. If the proprietors did not "yield to [a] demand" that forced them to "engage in conduct

that seriously violate[d] their religious beliefs," they faced "severe" financial penalties. *Id.*  Such an intolerable choice, according to the Court, was a substantial burden on religious exercise. *Id.*

In holding so, the Court rebuffed arguments that "the connection between what the objecting parties must do"—provide coverage of potentially abortifacient contraceptives—"and the end that they find to be morally wrong"—destruction of human life— was "simply too attenuated" to constitute a substantial burden. *Id.* at 723.  Such an argument, according to the Court, "dodge[d] the question of what RFRA presents," which is whether a government policy "imposes a substantial burden" on the ability of individuals to act "in accordance with *their religious beliefs*." *Id.* at 724.  Instead, the argument "addresse[d] a very different question that the federal courts have no business addressing":  "[W]hether the religious belief asserted in a RFRA case is *reasonable*." *Id.* (emphasis added).  The proprietors "sincerely believe[d] that providing the insurance coverage demanded by the [federal] regulations [lay] on the forbidden side of the line" between prescribed and proscribed conduct. *Id.* at 725.  That was all that mattered—"it [was] not for [the Court] to say that their religious beliefs [were] mistaken or insubstantial." *Id.*

*Hobby Lobby* controls here.  Just as the religious proprietors feared their participation in the insurance program could lead to their facilitation of abortive activity, Jordan fears that providing birth certificate information to the government may catalyze the issuance of an SSN. And asking to be so branded contravenes Jordan's faith.  The honesty of this conviction cannot be doubted.  Jordan herself was given a partial birth certificate without her knowledge or consent, after hospital staff collected Jordan's DNA without her parent's approval. *See* Camichael Decl., ECF No. 35-4, ¶ 7.  And one of her family members was issued an SSN against his will.  Jordan Decl. ¶ 10.  Thus it is understandable that Jordan sees the passport application

process as a string of dominos. And it is undeniable that Jordan views filling out the paperwork as flicking the first domino in the line. That is all a court evaluating a RFRA claim can assess.

The Department suggests that Jordan's case is different from *Hobby Lobby*. According to it, in *Hobby Lobby*, the proponents of the contraceptive mandate were attacking how the proprietors interpreted the tenets of their own faith. Dep.'s Reply Br. at 8–10. But here, the Department does not doubt that Jordan's faith compels her to avoid the issuance of an SSN. Rather, the Department only seeks to disprove the *secular* and *factual* belief that Jordan faced a risk of receiving an SSN. Dep.'s Reply Br. at 8–10; Hr'g Tr. 44:5–11 ("I don't think there's any realistic concern…").

But to deem a belief secular rather than religious is to beg the question. After all, "we are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith." *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 566 (7th Cir. 2014) (Flaum, J., dissenting), *cert. granted, judgment vacated sub nom., Univ. of Notre Dame v. Burwell*, 575 U.S. 901 (2015). Faith implicates "difficult and important question[s] of religion and moral philosophy" that necessarily involve individualistic calculations of tolerable levels of risk and complicity. *Hobby Lobby*, 573 U.S. at 724. Sure, those calculations will use factual understandings as *inputs*. But an adherent's ultimate assessment of the risk—and thus her ultimate perceived degree of culpability—is the *output*, and *that* necessarily involves faith-based value judgments. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1154 (10th Cir. 2013) (Gorsuch, J., concurring) ("[T]he mandate infringes [plaintiffs'] religious liberties by requiring them to lend what their religion teaches to be an impermissible degree of assistance to the commission of what their religion teaches to be a moral wrong."). In other words, an adherent's understanding of the spiritual consequences of an action—and her own concomitant

blameworthiness—is deeply personal and part of her faith itself.  It is not the role of the Court to correct that understanding by trying to prove her wrong.

Even if Jordan is "misguided in thinking that th[e] scheme" is spiritually risky, "[t]hat is not [the Court's] call to make under the first prong of RFRA."  *Priests for Life v. Dep't Health and Hum. Servs.*, 808 F.3d 1, 17 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from the denial of rehearing en banc).  That is, "[Jordan's] legal interpretation" of what triggers the issuance of an SSN "is beside the point.  What matters is whether [her] participation in th[e] . . . scheme—however minimal—violates [her] religious beliefs.  And the record offers no dispute about that fact."  *Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 756 F.3d 1339, 1347 (11th Cir. 2014) (W. Pryor, J., specially concurring).

Jordan sincerely believed that acquiring a birth certificate or applying for a Letter of No Record would violate her religious beliefs.  That is where the inquiry stops.  Because Jordan was put to a choice between violating her religious beliefs and receiving a passport, she was made to suffer a substantial burden on her religious exercise.

That brings the Court to strict scrutiny.  The Department satisfies strict scrutiny only if it "demonstrates that application of the burden to [Jordan] is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  Put differently, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so."  *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).  This is a "difficult hill to climb, and it was never meant to be anything less."  *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020).  The Department does not surmount it.

To begin with, the Department has not shown that it has a compelling interest in requiring Jordan to supply a birth certificate or a Letter of No Record. It insists that "[t]he Letter of No Record is necessary to confirm the non-existence of a U.S. birth record," and is "essential in examining the purported citizenship of a first-time applicant and is critical in preventing not only identify theft and fraud but is essential in upholding the integrity of a U.S. passport." Dep.'s Mot. Summ. J. at 37. Perhaps. But as "critical" as these "generalized interests . . . may be," the Department "cannot rely" on them to satisfy its burden. *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 298. The Court must "loo[k] beyond" the Department's "broadly formulated interests" and instead "scrutinizin[e]" whether the Department has a compelling interest in requiring "*the particular claimant*" to satisfy the documentary requirements. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (emphasis added). The Department does not even mention Jordan while making its compelling interest arguments, instead invoking abstract notions of "national security" untethered from this dispute. Dep.'s Mot. Summ. J. at 37. This will not do.

The Department counters by arguing that it "is not at liberty to determine that certain documents are not needed for some individuals, like [Jordan], while requesting them from others to issue a passport." Dep.'s Reply Br. at 12. But that is precisely what RFRA requires of the Department. 42 U.S.C. § 2000bb-1 (requiring the government to show that the "application of the burden *to the person*" furthers a compelling interest) (emphasis added); *O Centro*, 546 U.S. at 431 (stressing RFRA's "focused inquiry" on "the asserted harm of granting specific exemptions to particular religious claimants."). More, the federal law regulating passport issuance explicitly recognizes that passports cannot be conditioned on First Amendment activity. 22 U.S.C. § 2721 ("A passport may not be denied issuance, revoked, restricted, or otherwise

limited because of any speech . . . protected by the first amendment to the Constitution of the United States.").  The Department must accommodate when it is necessary.  But the Department has not even argued how eliminating the Letter of No Record requirement for Jordan and only Jordan would undermine its interests in passport integrity.

Perhaps this is because the Department could not make such arguments if it tried.  Jordan has provided abundant independent evidence of her citizenship.  *See* Admin. R. at AR005–006, AR034–047.  It is unclear what a Letter of No Record from Jordan—a document that the Department admits is "not . . . directly probative of citizenship"—could add to the passport adjudication.  Dep.'s Mot. Summ. J. at 41.  No one suggests Jordan poses a risk to national security or is engaging in criminal conduct.  Thus the Letter appears superfluous.  It may be a rote administrative requirement to the Department, but it carries the threat of iniquity for Jordan.

More, the history of these proceedings reveals that requiring Jordan to obtain a Letter of No Record was not the least restrictive means of carrying out the Department's generalized interests.  After some cajoling, the Virginia Defendants forked the Letter over to the Department without involvement from Jordan.  Dep.'s Mot. Summ. J. at 9.  Indeed, Virginia law envisions this circumstance, by allowing state officials to provide this information directly to the federal government.  *See* Va. Code § 32.1-272(D).  Clearly, then, the Department did not "lack[] other means of achieving its desired goal[s]."  *Hobby Lobby*, 573 U.S. at 728.

While the Department insists that it had no "obligation to seek [the Letter] on behalf of" Jordan, Dep.'s Reply to Pl.'s Stmt. of Material Facts ¶ 54, RFRA "may in some circumstances require the government to expend additional funds"—and efforts—"to accommodate citizens' religious beliefs."  *Hobby Lobby*, 573 U.S. at 730.  The Department could have worked with the Virginia Defendants from the beginning, thereby eliminating the need for Jordan to pay a

spiritual toll.  When a potential compromise like that exists, the Department cannot show it pursued the minimally onerous path.

The short of it is:  The Department imposed a substantial burden on Jordan, and it failed to show that the burden was the least restrictive way of achieving a compelling interest.  Jordan is entitled to summary judgment on her RFRA claim.[2]

## C.

With the RFRA claim resolved, the Court proceeds to Jordan's claim under 8 U.S.C. § 1503(a).  This provision authorizes "any person . . . denied [a] right or privilege by any department or independent agency, or official thereof, upon the ground that [s]he is not a national of the United States" to "institute an action" in the federal district courts "for a judgment declaring [her] a national of the United States."  8 U.S.C. § 1503(a).  This category of "right[s]" and "privilege[s]" includes a passport.  *Icaza v. Shultz*, 656 F. Supp. 819, 822 (D.D.C. 1987).  To prevail under § 1503(a), Jordan "need make only a prima facie case establishing [her] citizenship by birth or naturalization," at which point the burden shifts to the government to present "clear, unequivocal, and convincing evidence rebutting the plaintiff's showing of citizenship."  *L. Xia v. Tillerson*, 865 F.3d 643, 652 (D.C. Cir. 2017) (cleaned up).

Jordan is entitled to relief on her § 1503(a) claim.  The Department concedes that Jordan is a U.S. citizen, and Jordan has proffered a body of evidence establishing as much.  Peek Decl. ¶ 15; Admin. R. at AR030–AR047.  Thus Jordan is entitled to the issuance of a passport, and the Court will order the Department to provide Jordan with a passport right away.[3]

---

[2]  Jordan concedes that a favorable judgment on her RFRA claim eliminates the need for the Court to opine on her First Amendment claim.  Hr'g Tr. 18:3–5 ("If you rule on RFRA, it does not need to get into the free exercise claim.").  The Court treats that concession as a voluntary dismissal, given it has favorably disposed of the RFRA claim.

[3]  Jordan's success on her § 1503 claim extinguishes her APA claims.  *See* Pl.'s Reply Br. at 32 (conceding that full relief on the § 1503 claim obviates her APA claims); 5 U.S.C. § 704 (only APA claims "for which there is no other adequate remedy in a court are subject to judicial review.").  More, Jordan has not moved for summary judgment on

**D.**

A final note on remedy is in order.  The Court will provide Jordan with the injunctive relief she requests:  An order directing the Department to "to issue Mrs. Jordan a U.S. passport forthwith."  Pl.'s Prop. Order, ECF No. 35-10, at 1.

"[T]he traditional scope of injunctive relief" is "the extent necessary to protect the interests of the parties."  *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022).  Any injunction should be "limited to the inadequacy that produced the injury in fact that the plaintiff has established," and "no more burdensome to the defendant than necessary to provide complete relief to the parties."  *Gill v. Whitford*, 585 U.S. 48, 68 (2018); *Califano v. Yamasaki*, 422 U.S. 682, 702 (1979).  Jordan's harm stems from the Department's persistent refusals to issue her a passport, in violation of her rights under RFRA and § 1503.  Absent such violations, Jordan would now have her passport in-hand, without the need to shoulder additional administrative burdens and costs.  Thus an injunction directing the Department to issue the passport is necessary to remediate Jordan's injuries.

Such relief is not unduly burdensome to the Department.  The most recent photograph and home address that Jordan provided is only two years old.  The typical lapse between passport applications is ten years (the duration between issuance and renewal).  So the Department is not made to suffer unwarranted harm by issuing a passport without mandating Jordan jump through additional hoops—hoops that Jordan likely perceives as endlessly proliferating.  It is time that the Court releases Jordan from this bureaucratic funhouse.

---

her Mandamus Act claim.  Am. Compl. Count VII.  But seeing as mandamus also requires a plaintiff to show she has "no adequate alternative remedy," *Illinois v. Ferriero*, 60 F.4th 704, 713 (D.C. Cir. 2023), the relief under § 1503 extinguishes the mandamus claim, anyway.

**IV.**

The Constitution does not contemplate that judges be spiritual arbiters.  If someone sincerely believes she risks her salvation by taking some action, the government may not condition a benefit on her doing so.  To find otherwise would be to arrogate an abhorrent authority.  The Court will not oblige Jordan to follow an agency's assessment of her personal convictions.  She is entitled to summary judgment and a passport.


Dated: July 29, 2025

TREVOR N. McFADDEN, U.S.D.J.