```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    * * * * * * * * * * * * * * *    )
     ABIGAIL CARMICHAEL JORDAN,        )    Civil Action
4                                      )    No. 24-01844
                    Plaintiff,         )
5                                      )
       vs.                             )
6                                      )
     MARCO RUBIO, et al.,              )    Washington, D.C.
7                                      )    July 17, 2025
                    Defendants.        )    2:03 p.m.
8                                      )
     * * * * * * * * * * * * * * *    )
9

10

                    TRANSCRIPT OF MOTION HEARING
11          BEFORE THE HONORABLE TREVOR N. McFADDEN
                    UNITED STATES DISTRICT JUDGE
12

13
     APPEARANCES:
14
     FOR THE PLAINTIFF:       ROBERT A. BATISTA, ESQ.
15                            JONATHAN C. BOND, ESQ.
                              JOHN SEIDMAN, ESQ.
16                            TAMARA SKINNER, ESQ.
                              ALY COX, ESQ.
17                            CHRISTIAN CONWAY, ESQ.
                              GIBSON, DUNN & CRUTCHER, LLP
18                            1700 M Street, Northwest
                              Washington, D.C. 20036
19

20   FOR THE DEFENDANTS:      THOMAS DUFFEY, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE FOR
21                             THE DISTRICT OF COLUMBIA
                              555 Fourth Street, Northwest
22                            Washington, D.C. 20530

23

     FOR THE DEPARTMENT       JULANNA BAE, ESQ.
24   OF STATE (Observing):

25
```

```
 1      REPORTED BY:              LISA EDWARDS, RDR, CRR
                                  Official Court Reporter
 2                                United States District Court for the
                                    District of Columbia
 3                                333 Constitution Avenue, Northwest
                                  Room 6706
 4                                Washington, D.C. 20001
                                  (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  This is Civil Action

2    24-1844, *Abigail Carmichael Jordan versus Antony J. Blinken,*

3    *et al.*

4          Counsel, please come forward to identify

5    yourselves for the record, starting with the Plaintiff.

6          MR. BATISTA:  Good afternoon, your Honor.  Robert

7    Batista on behalf of the Plaintiff, Mrs. Abigail Carmichael

8    Jordan.  And joining us today is Mrs. Jordan along with her

9    family.  Joining me at counsel table:  Jonathan Bond, John

10   Seidman, Tamara Skinner, Aly Cox and Christian Conway from

11   Gibson, Dunn.

12         THE COURT:  Good afternoon, folks.

13         MR. DUFFEY:  Good afternoon, your Honor.  Tom

14   Duffey, assistant United States attorney, here for the

15   United States.  With me at counsel table and observing is

16   Julianna Bae, from the State Department.

17         THE COURT:  Good afternoon, folks.

18         We're here for a motions hearing.  I've review the

19   parties' cross-motions for summary judgment.  I'm interested

20   in hearing your arguments.

21         I'll tell you kind of my initial inclinations are,

22   one, that among the various claims, I am inclined to think

23   the RFRA claim is probably the strongest and may well be

24   correct.  Also, I think the Government raises a strong

25   argument on mootness.

1          So, Mr. Batista, I'm particularly interested in

2     hearing from you on why this case is not now moot.

3          I'll hear from Plaintiffs.

4          MR. BATISTA:  Thank you, your Honor.

5          May it please the Court:  Across three passport

6     applications, Mrs. Jordan submitted voluminous evidence

7     establishing beyond any reasonable dispute that she is a

8     U.S. citizen.

9          The State Department has never called that

10    evidence into question.  Yet it still refused to issue

11    Mrs. Jordan a passport solely because she did not also

12    submit a letter of no record.  That refusal was unlawful for

13    at least three reasons:

14          First, Mrs. Jordan made clear to the Department

15    that she was not able to obtain that letter of no record

16    without violating her sincere religious convictions.

17          Second, a letter stating that Virginia does not

18    have a birth certificate for Mrs. Jordan cannot plausibly be

19    probative of her U.S. citizenship.

20          And, third, the letter of no record requirement

21    was repealed from the regulations nearly 20 years ago.

22          The Department now says that its belated action in

23    February obtaining a letter of no record from Virginia means

24    there's no longer a live controversy.

25          That's incorrect.  The Department has not issued

1    Mrs. Jordan a passport, and the passport denial decision is

2    still the agency action before this Court.

3         In any event, the Department's attempt to moot

4    this case is textbook voluntary cessation, which cannot

5    extinguish a controversy unless the Department carries its

6    formidable burden to demonstrate with absolute clarity that

7    its challenged conduct cannot recur.

8         The Department has not come close to shouldering

9    that heavy burden.  The Supreme Court held last term in

10   *Fikre* that even a declaration under oath was insufficient.

11   And here, the Department has not even done that.

12        Instead, the Department has merely had its counsel

13   make representations in its legal briefs.  If the Department

14   were serious about fulfilling the assurances in those

15   briefs, then it should have been willing to enter into a

16   binding consent decree.  But it refused.

17        Mrs. Jordan, therefore, remains in need of relief

18   that this Court can and should grant.  It should order the

19   Department to issue a passport, relief that other courts

20   have ordered.

21        At a minimum, the Court should issue a declaratory

22   judgment that Mrs. Jordan is a U.S. citizen and that the

23   Department cannot again require her to submit a letter of no

24   record or a birth certificate.  That relief would

25   meaningfully secure Mrs. Jordan's rights against future

1    infringement by the Department, whether tomorrow or in ten

2    years.

3              THE COURT:  What about the declaration,

4    Mr. Batista?  Why isn't that sufficient, the declaration

5    from the Government?

6              MR. BATISTA:  Your Honor, I would say for at least

7    three reasons.  Well, first of all, the declaration that is

8    in the record, I think, the relevant paragraphs here are

9    Paragraphs 15 to 16 of Director Peek's declaration.  All it

10   says is that the Department intends to issue her a passport

11   upon completion of these additional requirements that it

12   levied at the last motion.

13             It says nothing about what the Department even

14   currently intends to do with respect to that passport once

15   she has it in hand.

16             And so again, in *Fikre*, where you did at least

17   have current intentions about what the Department would do

18   in the future, the Supreme Court held that was not

19   sufficient.

20             And so I don't think -- the key point here, your

21   Honor, is that the representations that appear at Pages 29,

22   31 and 45 of the Department's opening brief and Pages 23 to

23   24 of the Department's reply brief, those representations

24   appear nowhere in Director Peek's declaration.

25             THE COURT:  So the declaration does not have some

1    of the important factors that you think are said in the

2    brief, but it's just a lawyer's position on that?

3              MR. BATISTA:  Yes, your Honor.  The Department at

4    best here has made representations in its briefs about what

5    it intends to do, what it currently intends to do with

6    respect to the passport in the future.  Those

7    representations are simply not in Director Peek's

8    declaration.  And so the Department had two opportunities

9    here to put those representations in a declaration, and the

10   Department has not done so.

11             And so as it stands before this Court, the

12   question is:  Has the Department carried its formidable

13   burden?  And what is before the Court?  I think it is plain

14   that that has not been met.

15             THE COURT:  And so the declaration, though, says

16   that we have a letter of no record and we won't need a

17   letter of no record again, nor will she need to produce a

18   birth certificate, and that that would be correct under

19   their regulations.

20             Why doesn't that make this different than *Fikre*,

21   where the declaration was much more kind of temporal as,

22   like, "Based on what we know now, you're not going to be

23   added back to the No Fly List"?

24             MR. BATISTA:  Your Honor, I can double-check the

25   declaration.  But I believe the first part of your Honor's

1    question -- I do not believe those representations are in

2    Paragraphs 15 to 16 of the declaration.

3            But even if they were, I think it simply speaks to

4    the Department's current intentions.  It does not speak to

5    what -- it does not in any meaningful way, I think, bind,

6    even setting aside current officials, future officials at

7    the Department.

8            The reason why I think the lack of any way -- or

9    at least the Department has not provided any way to bind

10   future officials at the Department, why I think that is

11   especially relevant in this case is because of the fact that

12   passports must be renewed every ten years.  That effectively

13   guarantees -- this is not a case where it's speculative or

14   hypothetical that Mrs. Jordan would never even come into

15   contact with the Department again.

16           THE COURT:  Yes.  But isn't it correct that the

17   regs only require a birth certificate or letter of no record

18   for the initial application?

19           MR. BATISTA:  Your Honor, the regulation -- I

20   believe it's 5162, Subparagraph (a) -- says that the

21   Department can revoke a passport at any time on a basis that

22   it could deny a passport.

23           And so it's not the fact of -- the renewal is

24   relevant not because of whatever the requirements might be

25   for renewal.  The renewal is relevant because it effectively

1    guarantees that she'll be back on the Department's desk.

2    And I don't think it is a stretch that ten years from now an

3    official looking at this file could think, This letter of no

4    record that I have before me, that is not sufficient for

5    what it would have taken to give her a passport in the first

6    place.  And therefore, setting aside renewal requirements,

7    I'm initiating a revocation.

8            And so again, the renewal is about the fact that

9    her file will be back before the agency in ten years.  It's

10   not about necessarily what the Department's specific

11   requirements are for renewal.  It just sort of crystallizes

12   the ability of the agency to revoke it at any time, whether

13   tomorrow or in ten years.

14           THE COURT:  Yes.  So on that point, I guess, I

15   would have thought the regulations require these various

16   things, including a letter of no record, that she hadn't had

17   in the past, but she does have now.  So I would have thought

18   there wouldn't be a basis under the regulations for them to

19   revoke.

20           MR. BATISTA:  Your Honor, a few points on that.

21           I think it is telling, first of all, that the

22   Department in its briefs, as I read them, is essentially

23   reserving to itself virtually unfettered discretion in this

24   area.  I believe its reply brief uses the word "expansive

25   authority."

1          And so -- and to be clear, just to back up for one

2     moment, it is the Department that bears the burden in this

3     context.  Mrs. Jordan has no burden to point out potential

4     things that could happen in the future.  It is the

5     Department's burden to prove with absolute clarity that

6     those cannot reasonably be expected to happen.

7          And, you know, but of course, you know, I'm

8     happy -- I can point the Court, you know, to things that I

9     do think, you know, could happen.  For example, the -- in

10    ten years, the Department could say, Well, this letter of no

11    record is ten years old and we need to see a new one.

12         The letter of no record points to the existence of

13    a partial birth certificate in that last paragraph, which is

14    the same information that is reflected in the same

15    ancestry.com search that the Department thought contradicted

16    her search in that she has no birth certificate.  So by that

17    same logic, I don't see why the Department -- again, unless

18    it binds itself to the contrary, which it has not done here,

19    would not have the authority under its own view of its

20    authority to say, No, we need to see that completed birth

21    certificate, which of course just gets us back to the

22    original problem here.

23         And just one more point on the burden, your Honor:

24    You know, I certainly can understand the intuition of -- you

25    know, we're talking about things that are in the future.

1    But I think the intuition about hypotheticals and

2    speculation, I think that is an intuition that primarily

3    comes out of the Article III standing context.

4         And I do think that *West Virginia v. EPA* is very

5    clear that it is a different analysis in the mootness

6    context.  And *Friends of the Earth v. Laidlaw* specifically

7    said at Page 190 of that decision that the prospect of

8    recurrence may be too speculative to support standing; but

9    at the same time, it may not be too speculative to overcome

10   mootness.

11        And I think that's the way to think about it here.

12        THE COURT:  Is this really a voluntary cessation

13   situation?  Why shouldn't I be thinking about this from the

14   perspective of:  The Defendants have always demanded a

15   letter of no record.  Now they have it.  But they didn't

16   voluntarily cease some conduct.  Rather, a third party

17   provided them the -- what they've already -- always

18   requested.

19        MR. BATISTA:  Well, to be clear, your Honor, we

20   agree it's not a voluntary cessation, principally because

21   she has not received her passport.

22        But to your Honor's question, I think the way to

23   think about it there is that the Department has ceased its

24   position that she must provide this letter of no record,

25   which of course was the issue, because she could not obtain

1    it without violating her religious convictions.

2         And the Department got it from Virginia in

3    February.  And I think -- and so I think that's the way to

4    think about it in terms of if we are in voluntary cessation

5    world, I think that is what we can think of, is what has

6    been ceased.

7         That, I think, dovetails, going back to my

8    opening, with the relief that we are seeking, namely that it

9    cannot -- its current position that she didn't have to

10   provide this letter, we are essentially asking at minimum

11   for a declaration that essentially makes that permanent as

12   to her moving forward, that it cannot again require her to

13   provide this letter of no record.

14        THE COURT:  On that question of how they got it,

15   the Defendant's briefing anyway was a little confusing to me

16   on their position about how this happened.  There were kind

17   of suggestions in the text that it was a result of your

18   lawsuit that the Commonwealth sent the letter, but then

19   there are also a couple of footnotes saying that Mr. Duffey

20   had actually reached out to the state directly and requested

21   it.

22        What's your view on how they came to have the

23   letter?

24        MR. BATISTA:  Your Honor, I'll say up front that

25   this is largely not in the record.  I think the one place I

1    would point to that is in the record is Docket No. 31, one

2    of Mr. Duffey's extension motions, where he says that he and

3    Virginia have been in discussions regarding the case or

4    something to that effect.

5         My understanding -- and again, some of this is

6    based on what's outside the record -- is that the Department

7    and Mr. Duffey was trying to get this letter of no record

8    and reached out to Virginia.  And at minimum, my

9    understanding is that it was a mutual conversation.  I can't

10   speak to who reached out to who first.

11        But my understanding, even before Virginia came

12   into the case, is that Mr. Duffey was trying to get this

13   letter of no record, which I think, to go back to our merits

14   argument, is -- at minimum was, you know, a less restrictive

15   means back in, you know, 2019 and certainly 2022.

16        THE COURT:  But your position is that it was not

17   because of your client's conduct or your lawsuit that the

18   Department received the letter?

19        MR. BATISTA:  Oh, I understand the question, your

20   Honor.

21        My understanding is the Department made no effort,

22   did not even consider doing that, until effectively the

23   appointment of counsel in this case.  Eight days before the

24   appointment of counsel, the Defendants filed a motion to

25   dismiss, saying there is no viable claim here.

1        And so I do think if we're going back to voluntary

2    cessation, I do think this is a case where there is a strong

3    inference that the Department denied her a passport for many

4    years, got sued, did nothing about it at first.  Once

5    counsel was appointed, it changed its tune.  And now it

6    wants effectively, I think, to make this one case go away

7    without being bound moving forward.

8        And I think that is the critical piece here, that

9    it has consistently avoided anything that would bind itself

10   moving forward.  It has rejected a consent decree.  The

11   declaration in the record is -- does not speak to the

12   representations that are in its briefs.

13       And for that reason, that is why at minimum we are

14   seeking declaratory relief that secures her rights moving

15   forward.

16       THE COURT:  So let's assume that you're correct

17   that I should be doing kind of the voluntary cessation

18   framework.  I think you are arguing that that's the

19   framework under which I should be analyzing mootness.

20       Is it true that this requirement for an updated

21   photograph and application really constitutes a,

22   quote-unquote, "fact of the alleged violation"?  It looks to

23   me like the Circuit has been clear that this prong of the

24   voluntary cessation exception requires a showing of some

25   tangible, concrete effect traceable to the injury and

```
 1          curable by the relief demanded.

 2                  But that clearly remains.  Is that really --

 3          what's left here, is that really an injury or an effect of

 4          the alleged violation?

 5                  MR. BATISTA:  A couple responses, your Honor.

 6                  If I'm understanding correctly, I think your Honor

 7          may have been quoting the -- essentially the second prong of

 8          the voluntary cessation analysis.

 9                  THE COURT:  Yes.

10                  MR. BATISTA:  So my first answer is that the

11          Department -- if it fails either of those prongs, then the

12          case is not moot.

13                  But as to that prong specifically, I think, number

14          one, the fact that she doesn't have her passport, which can

15          be traced back to those violations, is why we're not even

16          necessarily in voluntary cessation framework in the first

17          place.

18                  But I do think it is certainly part of our

19          argument that the Department says the reason for these

20          additional requirements is that it has been more than two

21          years since she last applied for a passport.

22                  The only reason for that is because the Department

23          unlawfully denied her a passport in that period of time.

24                  And so I do think those requirements and the

25          reason she does not yet have her passport can be directly
```

1    traced back to the Department's original violations.  And I

2    think that goes again to both why there's still very much a

3    live claim and we don't even have to get into the voluntary

4    cessation framework; but yes, I think at minimum it goes to

5    that second prong of the voluntary cessation analysis.

6            But certainly I would emphasize that the

7    Department has not met its -- what the Supreme Court has

8    described as a formidable burden.  I don't think, you know,

9    the Supreme Court describes burdens in that way too often,

10   your Honor.  And I do not think the Department has come even

11   close to carrying that burden here.

12           THE COURT:  Anything else you want to say on

13   mootness, Mr. Batista?

14           MR. BATISTA:  Just give me one moment, your Honor.

15           Yes, your Honor.  I think the other thing that I

16   would say -- and this, I think, relates to the question that

17   your Honor just asked about tracing back to the original

18   violations -- I think another reason that at bare minimum

19   her Section 1503 and APA claims are not moot is because the

20   operative agency action before this Court is the April 22nd,

21   2023, denial.  That's at Page 48 of the administrative

22   record.

23           And Mrs. Jordan I think at minimum is entitled to

24   a ruling on that denial, that it was unlawful because the

25   reason given was insufficient evidence of citizenship.

 1    Mrs. Jordan submitted voluminous evidence showing to the

 2    contrary.  And I think whatever the Department says about

 3    what it would do if it had a new application before it

 4    doesn't change the fact that that denial is still the agency

 5    action before this Court.

 6          And that dovetails again with in my opening the

 7    minimum relief that we are seeking here, namely a

 8    declaration that she is a U.S. citizen, that is relief that

 9    is plainly available under Section 1503, and a declaration

10    that the Department cannot again require that letter of no

11    record or birth certificate from her.

12          I think that is, you know, well-paired with the

13    declaration of citizenship.  And so I think also it comes in

14    under 1503.  But I think that at minimum it would come in

15    under the APA.

16          So I did just want to make that distinction, that

17    certainly we believe all of her claims are live.  But with

18    respect to tracing back to the original violations and the

19    additional requirements, I think a separate issue is the

20    fact that this agency action is still before this Court.

21          THE COURT:  So why don't we go there.

22          You have a number of different claims.  What's

23    your view on what's your strongest?  What would you feel

24    most comfortable defending to the Circuit?

25          MR. BATISTA:  Your Honor, I think all of them are

1    quite strong.  I think -- as your Honor suggested at the

2    outset, I think the RFRA violation here is quite plain.

3              And to be clear, I think that your Honor -- if you

4    rule on RFRA, it does not need to get into the free exercise

5    claim.

6              But I do think -- I mean, the crux of a Section

7    1503 claim is this issue of citizenship.  That was the basis

8    for the Department's denial.  That's clear from Pages 21, 48

9    and 51 of the administrative record.

10             And the Department does not even argue the merits

11   of that claim.  They essentially have two paragraphs across

12   both briefs on that claim.  As I understand it, their sole

13   argument on that claim is that it is moot, which of course

14   we think it is not, for the reasons given.

15             And I suppose what I would just say is essentially

16   just to reiterate what I said in my last answer, which is I

17   do think the fact that the agency action is still before

18   this Court and that squarely implicates the Section 1503 and

19   APA claims, I think that is an additional reason why those

20   claims are not moot.

21             THE COURT:  And so if I agree with you on 1503,

22   does the APA drop out?  Am I remembering that correctly?

23             MR. BATISTA:  Your Honor, I think that if your

24   Honor orders all the relief that we are seeking under 1503,

25   then yes.  I think the issue is that clearly a declaration

1    of citizenship is available under that cause of action.

2         There are courts, the *Lopez* case, the *Torres* case,

3    that we cited in our briefs, that do order broader

4    injunctive and declaratory relief under that cause of

5    action.  And so we do think we're entitled to those

6    additional remedies under that claim.

7         But at minimum, if those remedies are not

8    available under 1503, then I think it would not constitute

9    an adequate alternative remedy for her APA claims, which

10   under 5 USC 703 do clearly authorize declaratory and

11   injunctive relief.

12        THE COURT:  On RFRA, you know, the Government has

13   put forward various evidence now that applying for at the

14   very least a letter of no record is not actually going to

15   trigger an adult getting a Social Security card.  In fact,

16   there would be an additional step, I think they suggest,

17   even if she was seeking a birth certificate at this point.

18        Is it still correct to say that your client

19   sincerely believes that this process would require her to

20   violate her religious beliefs?

21        MR. BATISTA:  Yes.  I think very much so, your

22   Honor.

23        And I think the Government's -- it makes a point

24   that a letter of no record was generated by Virginia here

25   without issuance of a Social Security number.  But that was

1      when we were in litigation.

2             I don't think that speaks at all to what could

3      conceivably -- as far as her religious convictions go

4      outside the context of litigation.

5             And in addition, you know, her assessment of the

6      risk is very much part of her religious convictions.  I

7      think the relevant question there is:  Does her belief that

8      applying for this letter of no record reflects a -- that it

9      poses an unacceptable risk of issuance of a Social Security

10     number, does that reflect a sincere religious conviction?

11     And the declaration makes clear that it does.

12            The Department has not disputed sincerity.  And I

13     think this whole process, frankly, your Honor, has actually

14     probably reinforced that conviction.

15            THE COURT:  Again, I guess, is your position that

16     the Government was able to get the letter of no record

17     because of, I think, Virginia code requirements directing

18     the state office to cooperate with the federal government,

19     but that your client could not have -- and that they were

20     able to do that without obviously filling out these forms

21     that your client is concerned that could trigger a Social

22     Security number -- but she could not have done that?  Is

23     that your perspective there?

24            MR. BATISTA:  Yes, your Honor.

25            Her belief is -- it is about what actions in terms

1    of her religious convictions -- what God commands her to do

2    and not do.  It is about what actions she can and can't

3    take.

4              And when she went to the office and had the

5    interaction with the employees there, she formed the

6    conviction that there was simply an unacceptable risk that

7    filling out the rest of the form -- she filled out the first

8    half of the form, but it was the second half of the form

9    that was the issue, that filling out that form she could not

10   move forward as a matter of her sincere religious

11   convictions due to the fact that she did not feel

12   comfortable that she would fill out this form and that a

13   birth certificate wouldn't issue, that a Social Security

14   number wouldn't issue.

15             THE COURT:  And so is it appropriate for me to

16   probe the validity of the factual underpinnings of her

17   fears?  Is that -- you know, obviously, I think I'm not

18   supposed to and I'm not inclined to question her sincere

19   religious beliefs.  But is that the same thing -- does that

20   mean that I can't also question the validity of the factual

21   underpinnings, for instance, that filling out this

22   application for a letter of no record could trigger a Social

23   Security number being issued?

24             MR. BATISTA:  The short answer, your Honor, is

25   yes.  And I think the reason is here that her assessment of

1    that risk is part of the religious conviction.

2            Maybe a hypothetical could crystallize the issue.

3    Suppose someone said, I object to applying for a letter of

4    no record because I believe that if I do so it could cause

5    the end of the world, and my religious beliefs prevent me

6    from doing anything that could cause that.

7            I think many of us would say, There is a zero

8    percent chance of that happening.  That contradicts the laws

9    of physics.  But I think the sole question there is, if that

10   reflects the sincere religious conviction, I don't think

11   there is anything a court can do to second-guess that.

12           Certainly the implausibility of a religious belief

13   could certainly go to the sincerity issue.  But certainly

14   here, that is not a question.  And the Department has not

15   disputed that.

16           And so I think again the way to think about it is

17   her belief that applying for this letter of no record posed

18   an unacceptable risk of issuance of a Social Security

19   number -- or a birth certificate and in turn a Social

20   Security number, does that reflect a sincere religious

21   conviction?

22           The answer is unquestionably yes.

23           I would just add, your Honor, just to crystallize,

24   you know, compared to the hypothetical I gave, I do think if

25   we get into that, which of course we think we should not, I

1    do think she had quite a reasonable basis to form that fear.

2            THE COURT:  Is there case law that I should be

3    looking to that helps delineate that line that you're

4    describing?

5            MR. BATISTA:  Yes, your Honor.  I think the

6    principal cases here are *Hobby Lobby* and the *Thomas* decision

7    in 1981.  That's *Thomas versus Review Board*, which also

8    makes this point.

9            And I think there, that fact pattern in that case,

10   I think, is helpful because it's sort of the flip side of

11   what we have here.  There, their religious adherent was

12   working in a part of the factory where they made raw

13   materials that could conceivably go to the -- I guess the

14   turrets on the military tanks.  That was fine to him.  But

15   then he was moved to the part of the factory that actually

16   built the turrets directly.  And that was not fine for him.

17           And so I think we essentially have the flip side

18   here of -- that applying for a letter of no record is not

19   sufficient insulation to her from getting -- you know, being

20   assigned a Social Security number.

21           THE COURT:  Why isn't *Kaemmerling* unhelpful to you

22   and suggestive that this RFRA claim is invalid?

23           MR. BATISTA:  Your Honor, because like *Bowen*

24   *versus Roy*, that case is about the Government's own use of

25   something already in its possession.  In *Roy*, it was about

1   the use of the Social Security number.  In *Kaemmerling*, it

2   was about the use of -- I believe it was tissue samples or

3   something of that nature.

4        The Plaintiff in *Kaemmerling* did not object to

5   cooperating with collection of those samples.  And I think

6   that would be the apt analogy here, where that would have

7   required action on that plaintiff's part.

8        And here, the Department was unmistakably

9   requiring Mrs. Jordan to take action, namely to get this

10  letter of no record and to give it to them.

11       THE COURT:  Is it the Department's fault that

12  Virginia has this system that at least concerns her that she

13  would be triggering a Social Security number being created?

14  I mean, it sounds to me like, but for the bottom half of

15  that sheet, she would have been very comfortable applying

16  for the letter of no record.  Is that correct?

17       MR. BATISTA:  That is my understanding, your

18  Honor.

19       As to your Honor's question, I think the way to

20  think about it is that the Department as a federal agency

21  has a duty under RFRA not to be imposing substantial burdens

22  on religious adherents.

23       At minimum, when Mrs. Jordan made clear to the

24  Department that she could not obtain that document without

25  violating her sincere religious convictions and the

1    Department, despite knowing that, said, We need that

2    document for you to get a passport, at minimum, that is when

3    a substantial burden was triggered.

4         And that also goes back to the *Thomas* decision,

5    which I think lays out the relevant framework here, which is

6    that when the Government conditions receipt of a government

7    benefit on conduct that would violate someone's religious

8    convictions, that is a substantial burden.

9         And I think that is precisely the fact pattern

10   here.

11        THE COURT:  Turning to the APA claim, why doesn't

12   22 CFR 5145 give the Government the authority to request a

13   letter of no record?  Are you arguing that it's in conflict

14   with the statute 212?

15        MR. BATISTA:  That is certainly one of our

16   arguments, your Honor.

17        I think the statute very clearly makes allegiance

18   to the United States the touchstone, which the Department

19   itself interprets as you're either a U.S. citizen or a

20   noncitizen national.

21        And so I do think that what they are requiring,

22   and certainly given that all they invoked -- the only

23   rationale they invoked was the citizenship issue and not

24   these other issues that come up in its briefs, such as

25   identity theft and fraud and so forth, that what they're

1       asking for has to go to citizenship.

2               And the regulation itself has the limiting

3       principle of necessary to establish citizenship.  And so it

4       necessarily cannot be something that allows the Department

5       to ask for something that has nothing to do with

6       citizenship.

7               And I think other than what I've already said

8       regarding what a letter of no record shows, that it shows no

9       birth certificate, I think my other evidence for why a

10      letter of no record has nothing to do with citizenship is

11      actually the old regulation before it was repealed.  That

12      regulation says that -- what it said was:  We, the

13      Department, need you to give us that letter of no record

14      before we even consider your secondary evidence of

15      citizenship or of U.S. birth.  So I think that regulation

16      was drawing a clean distinction between a letter of no

17      record on the one hand and citizenship evidence on the other

18      hand.

19              And I think the Department, as far as I can tell

20      in Director Peek's declaration and in its briefs, I think

21      basically pivots to identity theft, fraud, credibility,

22      truthfulness.

23              These, your Honor, I think are distinct concepts

24      from the question of citizenship.  And they were not invoked

25      at any point during the adjudicative process.

```
 1                THE COURT:  Anything else, Mr. Batista?

 2                MR. BATISTA:  Just give me one moment, your Honor.

 3           I think that's all.

 4                THE COURT:  Thank you, sir.

 5           Mr. Duffey.

 6                MR. DUFFEY:  Thank you, your Honor.

 7                I would just like to say at the outset, I think

 8      this case could be quickly over, Judge, if you would sign

 9      the proposed order that we sent in with the Court denying

10      Plaintiff's motion for summary judgment, granting ours and

11      ordering the Plaintiff to submit the DS-11 and a current

12      photo, and she'll have her passport.  That could have been

13      done back in March.

14                I want to direct your Honor -- first, I want to

15      talk about the mootness of this case.  The declaration of

16      Mr. Peek from the State Department -- now, he's the director

17      of the office of adjudication within the passport services

18      directorate of the U.S. Department of State.

19                He says on Paragraphs 15 and 16 -- I'm just going

20      to paraphrase a bit here -- subsequent to the filing of the

21      amended complaint, it received a letter of no record.

22      Plaintiff's counsel was informed that this satisfies the

23      Department's requirements and it was prepared to issue

24      Plaintiff a passport.

25                As a result, the Department requested that
```

1    Plaintiff merely submit a signed passport application and a

2    recent photo in order to issue the U.S. passport.

3         Paragraph 16:  The State Department, upon receipt

4    of the letter of no record and in an effort to resolve this

5    matter, even provided Plaintiff with a person of contact at

6    the Department to expedite the issuance of her passport.

7         I provided that contact's name to Mr. Batista.

8    And she was prepared to issue the passport pronto upon the

9    receipt of that application and current photograph.

10        So, your Honor, we think this is -- this case is

11   clearly moot.

12        If you look at the case in a nutshell, Plaintiff

13   filed this lawsuit.  "I want a passport."

14        The Department said:  We need a letter of no

15   record in order to issue one in accordance with its

16   regulations.

17        The Plaintiff said:  Applying for a letter of no

18   record is going to violate my religious beliefs because it

19   may result in the issuance of a birth certificate, which

20   then may result in the issuance of a Social Security number.

21        The letter of no issue -- the letter of no record

22   is issued.  Plaintiff is not enumerated with a Social

23   Security number.

24        So the whole basis for this lawsuit has been -- is

25   no longer at issue, your Honor.  There's no longer any

1    impingement or infringement of her religious beliefs.  The

2    Department is satisfied.  It agrees it'll issue her a

3    passport, that she is a citizen.  And there's no concern

4    that this issue will continue in the future.

5          And one thing I want to point out:  I think -- the

6    issuance of the letter of no record was a very involved

7    process -- it wasn't.  I think it was the filing of this

8    lawsuit that resulted in the issuance of the letter of no

9    record.

10          I did try, and worked that situation out and

11   helped get that letter.  And I don't think the Government

12   should be penalized for that.

13          And I did inform Mr. Batista when I talked with

14   the Virginia Office of Vital Records -- they would not talk

15   to me, since I did not represent the Plaintiff, and that he

16   would have to do it.

17          So I think there were -- he had conversations with

18   the State of Virginia also to get this letter of no record.

19   And I know they entered into a settlement agreement in this

20   case.  And the State of Virginia agreed to keep the letter

21   of no record permanently in its files.

22          I, as a representative of the State Department,

23   their attorney, I represented to Mr. Batista that the

24   Department of State will keep a copy of the letter of no

25   record in its files.  And the Plaintiff's attorneys

1    obviously have the letter of no record.

2              So --

3              THE COURT:  So on how you came to receive it, I've

4    known you, Mr. Duffey, for a while, and I appreciate your

5    efforts to resolve this.  And I think, you know, you acted

6    as a good public servant.

7              But nonetheless, I mean, my impression is that

8    before the lawsuit, she could only get it through filling

9    out this information that she believed would trigger her

10   receiving a Social Security number.

11             As I understand the Plaintiff's briefing, there is

12   a separate method under Virginia law to allow Virginia to

13   communicate directly with the federal government.  You're

14   able to go have those communications and they send the

15   letter to you without going through these steps that she was

16   concerned would trigger the issuance of a Social Security

17   number.

18             Tell me if I'm wrong about that kind of factual

19   situation.  But assuming I'm correct, how is this -- that

20   feels to me like that is the State Department voluntarily

21   ceasing its conduct; that is, requiring her to get it in a

22   way that would potentially trigger her religious concerns.

23   Tell me if I'm wrong about that.

24             MR. DUFFEY:  Well, the burden is on the applicant

25   for a passport to provide the documentation that will

```
 1    satisfy the Department of State in order to issue a

 2    passport.

 3              THE COURT:  I completely agree.  But the burden is

 4    on you to show that this is moot.

 5              MR. DUFFEY:  Yes.

 6              Since the letter of no record was issued by

 7    Virginia and it was not unlawful for the Department of State

 8    to request that --

 9              THE COURT:  Not at all.  And I think they wanted

10    you to do that.  Right?  I think that was kind of the

11    suggestion, is that you could do this in a way that wouldn't

12    trigger a Social Security card being created in a way that

13    she couldn't.  And that's what you did.  Right?

14              MR. DUFFEY:  I attempted.  But my efforts were not

15    successful.

16              THE COURT:  Well, they sent the letter to you.

17    Correct?

18              MR. DUFFEY:  I think they sent the letter first to

19    me and then I provided it to the Plaintiff --

20              THE COURT:  Okay.

21              MR. DUFFEY:  -- on the same day.

22              THE COURT:  Sure.

23              But that sounds to me like -- well, it doesn't

24    sound to me like there was -- that this is kind of some

25    fictitious obstacle that the Plaintiff has been creating;
```

1    rather, that she couldn't get it without going through this

2    process that she was concerned would create a Social

3    Security number.  But you could.

4         MR. DUFFEY:  It was a joint effort, I believe, by

5    all three -- by both counsel and the State of Virginia to

6    try and get this letter of no record.

7         THE COURT:  So what's the point of making

8    Ms. Jordan submit a new paragraph and her current mailing

9    address?  I mean, again, if the Plaintiff is correct that

10   there's been -- she's been illegally prevented from getting

11   a passport for the last two years, why isn't this just

12   another obstacle to her getting the passport that she should

13   have gotten two years ago?  And if there had not been this

14   kind of issue with the letter of no record, she would have

15   gotten it two years ago and her address would be current and

16   her photograph would be current.

17        MR. DUFFEY:  Well, first, your Honor, according to

18   Mr. Peek's declaration, that's required of every applicant.

19   They need an application within two years and a photograph

20   within six months.  So it's -- that's required by Department

21   of State.

22        THE COURT:  Yes.  I get that.

23        But isn't the correct analysis at least from a

24   mootness perspective that she had a current application and

25   a current photograph, and the only reason she doesn't now is

1      because your client delayed for two years?

2              MR. DUFFEY:  No.  We didn't delay, your Honor.  We

3      denied the application because we didn't have the letter of

4      no record.

5              There were two denials.  There was the final --

6      the second application, I believe, was in December of 2022.

7              THE COURT:  Okay.

8              MR. DUFFEY:  Actually, September of 2022.  It

9      wasn't executed properly, then refiled in December.  So it

10     was more than two years.

11             So the Department was well within its regulations

12     to request an updated application and an updated photo,

13     which is of absolutely no burden to the Plaintiff.  It does

14     not take into account anything to do with her religious

15     beliefs and the ultimate fear of getting -- of being

16     enumerated with a Social Security number.  That issue has --

17     it's non, your Honor.  So having her submit this two-page

18     application and a current photo is of absolutely no burden,

19     religious or otherwise.

20             Mr. Batista was talking about the renewal.  And as

21     I pointed out in my brief at Page 10, Footnote 5, the

22     requirement for a birth certificate or a letter of no record

23     is for first-time applicants.

24             This issue is not going to come up again.  When

25     she renews in ten years, all she needs to do is submit a

1    renewal application, the fee and a current photograph.  As

2    long as there's no criminal activity or anything else, she

3    will -- it'll be automatically renewed.

4            So the concern that this point -- that this might

5    continue in the future and therefore the exception of

6    mootness applies is -- that's not applicable here, your

7    Honor.

8            THE COURT:  Why isn't Mr. Batista correct, though,

9    that your regulation -- that it can be revoked at any time

10   on the basis for its -- that it was originally required to

11   demonstrate?  Why wouldn't that kick in here, saying she

12   shouldn't have gotten it in the first place because she

13   didn't provide a letter of no record and therefore we're

14   going to revoke it?

15           MR. DUFFEY:  Because the record -- the regulations

16   say first-time applicants require a birth certificate or a

17   letter of no record.

18           She is no longer a first-time applicant.  She will

19   have her passport.  And there's no regulation that would --

20   there's no specific regulation that would prevent her from

21   renewing that.

22           The regulation cited by Mr. Batista is too broad.

23   That's probably in every code of federal regulations,

24   regulations similar to that.   But here, Mr. Peek has said

25   under pains and penalties of perjury he will give her her

1    passport on receipt of those two items.

2            The regulations for renewal don't require a birth

3    certificate or a letter of no record.

4            So that -- those are the applicable regulations,

5    your Honor.

6            THE COURT:  Looking at RFRA, I understand that

7    your argument is you require a letter of no record.  This is

8    not -- it does not have religious implications or overtones

9    to it.

10            But can -- I mean, imagine with me that at least

11    the way Virginia has set up its letter of no record

12    requirement, that that is a violation of her religious

13    beliefs.  Isn't -- I mean, I don't think you could kind of

14    offload or get around your obligations by saying that's

15    Virginia's problem.  Correct?

16            MR. DUFFEY:  I think we can, your Honor.

17            THE COURT:  How is that?

18            MR. DUFFEY:  It's not a substantial burden if

19    they -- the Plaintiff ran into some red tape with the

20    Commonwealth of Virginia.  That was an issue between

21    Plaintiff and Virginia.

22            It wasn't -- that wasn't a situation that could be

23    controlled by the Department of State.

24            THE COURT:  Well, so help me with that, because I

25    mean, ultimately, the State Department has the authority to

1    decide who gets passports.  You've got a lot of discretion

2    over that.

3        And I wouldn't have thought that the State

4    Department could make a requirement.  You kind of offload

5    its requirements onto another party if that party is

6    violating the applicant's religious rights.

7        MR. DUFFEY:  I think your Honor might be getting

8    to, like, the *Hobby Lobby* analysis.

9        THE COURT:  Sure.  Yes.

10        MR. DUFFEY:  Well, there, it was -- the Government

11   had a directive that insurance companies had to provide

12   contraception coverage for employees, including for items

13   that would terminate a fertilized egg.

14        So that -- something like that -- and this is what

15   I wanted to point out on the RFRA thing -- that's the clear

16   government directive that's violative of a religious belief.

17        And that's not the kind of situation that we have

18   here.  The Department is requiring a letter of no record.

19   Mr. Peek has described why it's necessary:  to prove

20   citizenship and to prevent fraud, et cetera.

21        And this case was exacerbated by the fact that

22   there was evidence of a birth certificate or some sort of

23   birth record for the Plaintiff.  And that was also a concern

24   at the State of Virginia.

25        I believe the record reflects that when

```
 1    Mr. Batista contacted the State of Virginia, they said, Hey,

 2    we can't give you this letter of no record because we have

 3    a -- there's some sort of birth record for this person.  So

 4    that was not something that the State Department was

 5    involved in.

 6              THE COURT:  I get that.  I want to get to that in

 7    a minute.

 8              But I guess, you know, let's say Virginia said, We

 9    will only give letters of no record to applicants who have a

10    Social Security number.

11              You couldn't hide behind Virginia's violation of

12    her religious freedom in that circumstance.  Correct?

13              MR. DUFFEY:  I believe you could.  But that isn't

14    what happened here.

15              THE COURT:  I understand that.

16              But my point is that, I mean, I think what you're

17    suggesting is that maybe Virginia's procedure for getting a

18    letter of no record violated her religious rights, but

19    "That's not our problem; that wasn't our decision."

20              And I guess I'm questioning that argument.  It

21    seems to me that you can't offload your decision to give a

22    passport to a third party if that third party is violating

23    the person's religious freedom.

24              MR. DUFFEY:  But here, Virginia didn't violate her

25    religious freedom.
```

```
1                THE COURT:  Okay.  Well, the Plaintiff is arguing

2       otherwise.

3                MR. DUFFEY:  They gave her the letter of no

4       record.

5                THE COURT:  After you made multiple calls to them.

6       Right?

7                MR. DUFFEY:  It wasn't my calls to them; it was

8       Plaintiff's lawsuit that was the impetus for the issuance of

9       the letter of no record.

10               THE COURT:  I can certainly see how Gibson, Dunn

11      suing Virginia might have had them pay attention in a way

12      they weren't before.

13               I'll tell you, I was a little confused by the

14      argument that the letter of no record helps prevent fraud.

15      Maybe you can just help me understand how this works.

16               I was born in 1978.  Let's say that I wanted to

17      get a fraudulent -- I wanted to claim that I was born in

18      1968.  And so I send this information to Virginia and I say:

19      Please confirm that there's no birth certificate for me in

20      1968.  And, lo and behold, they will confirm that.  Right?

21      Even though it's precisely because I'm misleading them that

22      they will return that letter.

23               How does that letter help you, the letter of no

24      record?

25               MR. DUFFEY:  But if you -- they would find -- if
```

1    you submitted a letter to -- were you born in Virginia?

2             THE COURT:  Yes --

3             MR. DUFFEY:  So --

4             THE COURT:  -- as it turns out.

5             MR. DUFFEY:  Oh, okay.  So if you sent that

6    letter, they would use your name, et cetera, and they would

7    find your birth record.

8             THE COURT:  My correct birth date?

9             MR. DUFFEY:  I'm sorry?

10            THE COURT:  My correct birth date?  They would

11   come back and say:  No.  We do have your -- a birth

12   certificate for you.  It's from 1978, not 1968?

13            MR. DUFFEY:  Yes.  Yes.

14            THE COURT:  So that helps confirm that the

15   person -- if the person gives the correct name and correct

16   state, you should be able to identify whether or not they're

17   given the correct birth date?  I guess it just --

18            MR. DUFFEY:  I see.

19            THE COURT:  -- the letter of no record, I mean, it

20   feels to me like -- I'm having a hard time seeing how

21   valuable that is.

22            MR. DUFFEY:  Here it was a cause of concern

23   because the Plaintiff indicated that she had no birth

24   record.

25            But research confirmed that someone with a similar

1    name, birth date, et cetera, had a birth record.

2        So the State Department was operating from a

3    position of, We're getting an application for passport from

4    someone who says they don't have a birth certificate, but

5    when we did a little research, we find out that there may be

6    someone who -- there appears to be a birth certificate of

7    someone with similar characteristics.  So that's an

8    indication that there's going to be sort of something

9    untoward going on that needs further investigation.

10       THE COURT:  What could that something untoward be?

11       MR. DUFFEY:  Maybe the person applying for the

12   passport is not the -- is -- there's a record of someone

13   else that -- with her name.  So there could be a question of

14   identity, someone using someone else's name, someone else's

15   identity, to try and get a passport --

16       THE COURT:  But --

17       MR. DUFFEY:  -- and engage in international

18   travel.

19       THE COURT:  -- I mean, if it turns out that there

20   is, in fact, her name with the date of birth that she

21   supplied, it would feel to me like that would just confirm

22   everything that she's saying.  The fact that she didn't know

23   she had a birth certificate, I guess I'm struggling to see

24   how that shows fraud.

25       MR. DUFFEY:  Well, the letter of no record

1    confirmed that there was no -- that the two records referred

2    to the same person.  So there was no -- it satisfied the

3    Department that there was no -- there wasn't another person,

4    another -- with that name.  There wasn't another identity, a

5    person with that identity.

6          So it was a letter of no record that confirmed

7    that the Plaintiff was the person identified on that other

8    record.  So she said she doesn't have a birth record or

9    birth certificate.  Research indicated there was.  The

10   letter of no record, which was issued by the State of

11   Virginia, confirmed that those two records referred to the

12   same person.

13         THE COURT:  So you rely on *Kaemmerling* and *Bowen*.

14   But isn't Ms. Jordan objecting to something she feels like

15   the Government is making her do, that is, apply for a Social

16   Security number?  And doesn't that distinguish this from

17   *Kaemmerling* and *Bowen*, where the -- like in *Kaemmerling*, the

18   Plaintiff didn't object to the extraction of his bodily

19   fluids.  He was objecting to what they might do with it

20   afterwards.

21         MR. DUFFEY:  On the RFRA front, your Honor, I

22   think the more pertinent cases are *Hobby Lobby*, *Capitol*

23   *Hill*.  And I think *Capitol Hill*, your Honor, was your case.

24         THE COURT:  It was.

25         MR. DUFFEY:  If you look at those cases and

1    compare them to this case and the religious burden at issue,

2    as I said before, *Hobby Lobby* involved forcing employers to

3    provide contraception that would terminate a pregnancy.

4        *Capitol Hill* involved regulations issued by the

5    District of Columbia that during the pandemic congregations

6    couldn't meet -- a certain number of congregants couldn't

7    meet.  But that was -- the essence of a church is meeting as

8    a group.

9        And here, the concern at issue is the fear that

10   filling out a form might possibly lead to the issuance of a

11   birth certificate, which in turn might lead to the issuance

12   of a Social Security number, which all the cases I have seen

13   on substantial burdens in the RFRA area, nothing comes close

14   to establishing that as a significant burden.

15       The Plaintiff also cites in her declaration or

16   affidavit that her mission is to spread the gospel.  And

17   that has never been infringed by the Department of State.

18   Even without the issuance of a passport, she could still

19   spread the gospel in her community, in the United States.

20   There's no specific burden that you can't spread the gospel

21   in another country.

22       THE COURT:  I think she relied on the Great

23   Commission to spread the gospel in Judea and Samaria and to

24   the ends of the earth.  Right?  Isn't that the idea, that

25   it's international?

1          MR. DUFFEY:  I'm sorry, your Honor?

2          THE COURT:  I think she relied on the Great

3    Commission that you're supposed to spread the gospel to the

4    ends of the earth.

5          MR. DUFFEY:  Yes.  That includes the United States

6    and her local community.

7          THE COURT:  Yes.  It includes, not ends, there.

8          MR. DUFFEY:  So I think with RFRA, the Plaintiff I

9    don't think has been substantially burdened by requesting a

10   letter of no record for the reasons I've stated.

11         The case law, I think, says a substantial burden

12   is when the action of the Government rises above, like,

13   *de minimis* inconvenience.

14         And here, I think applying for the letter of no

15   record would amount to a *de minimis* inconvenience at most.

16         THE COURT:  And would you say that -- let's just

17   suggest for the moment between you and me that a letter of

18   no record would definitely result in a Social Security

19   number being generated.

20         Would that still be your position, that that would

21   not be a substantial burden?  Or is your point that on the

22   facts that we know here, the likelihood that filling out

23   that application will result in a Social Security number is

24   so attenuated that there's not a substantial burden?

25         MR. DUFFEY:  It's more that the likelihood is very

 1    unlikely.  It's very attenuated.  It's a two-step process.

 2    And I provided in my papers, your Honor, for an adult to get

 3    a Social Security number, there's a process that has to be

 4    undertaken, which includes a personal interview.

 5            So here, I don't think there's any realistic

 6    concern that someone like Plaintiff at that age applying for

 7    a letter of no record -- and then again, it's a two-step,

 8    attenuated process -- I don't think that would result in the

 9    issuance of a Social Security number.  Other steps would

10    have to be undertaken in order to -- for her to be issued

11    that.

12            THE COURT:  And so do you believe it's appropriate

13    for me to, I guess, question the reasonableness of her

14    concerns?  In other words, we can agree that she has a

15    religious right not to want to be enrolled in Social

16    Security, and we're not going to question that.  But the

17    steps that she fears would lead to that to my mind would not

18    in fact lead to that, and therefore there's not a

19    substantial burden.  Is that an appropriate judicial

20    undertaking?

21            MR. DUFFEY:  I think you can't question her

22    beliefs.

23            But a substantial burden, being a question of law,

24    I think you can look at the whole factual circumstances.

25    And it's up to you to make a determination what -- whether

1     it constitutes a substantial burden.

2            Some of the case law -- let's see.  The question

3     that RFRA presents is whether the challenged action imposes

4     a substantial burden on the ability of the objecting party

5     to conduct business in accordance with their religious

6     beliefs.  That's *Hobby Lobby*.

7            Substantial burden is when government action puts

8     substantial pressure on an adherent to modify his behavior

9     and violate his beliefs.

10           And I think here, it's been shown that obtaining

11    the letter of no record was not a substantial burden.

12    Plaintiff got the letter of no record without any of this --

13    any of her concerns being realized.

14           THE COURT:  On the APA, why isn't the letter of no

15    record requirement publicly available?

16           MR. DUFFEY:  It was -- it's been transferred to

17    the Foreign Affairs Manual, your Honor.  I cited and I

18    attached it as an exhibit.

19           THE COURT:  Yes.  I saw that.  I mean, I was a

20    little surprised, because the State Department has a lot of

21    publicly available regulations on what's expected; and then

22    it's a little odd that there's this kind of secret law that

23    you must have a certificate of no record when the regs

24    suggest that's one of several ways that you could prove your

25    citizenship.

 1          MR. DUFFEY:  Well, according to the State

 2    Department website, which your Honor can take judicial

 3    notice of it, the Foreign Affairs Manual is a single

 4    comprehensive and authoritative source for the Department's

 5    organization, structures, policies and procedures that

 6    govern the operations of the State Department.

 7          The FAM conveys codified information to Department

 8    staff and contractors so they can carry out their

 9    responsibilities in accordance with statutory, executive and

10    Department mandates.

11          THE COURT:  Mr. Batista argues that at the very

12    least, the 1503 relief is appropriate and declaratory relief

13    that Ms. Jordan is a U.S. citizen because the current state

14    of play before me is the State Department has denied her

15    application, as you point out, and that that is relief that

16    I can give regardless of the passport question.  Is he

17    correct about that?

18          MR. DUFFEY:  I don't think so, your Honor.  I

19    think it gets back to mootness, your Honor, that according

20    to Mr. Peek's declaration, we've -- they've unequivocally

21    stated that they will -- she satisfied the citizenship

22    requirements.  They're going to issue her a passport.  And

23    so there's no more remaining issue regarding 1503.  It's

24    moot.  We've agreed that she satisfied the citizenship

25    requirement upon receipt of the letter of no record.  And

1    it's unequivocally stated by Mr. Peek that she will get her

2    passport upon the submission of the updated application and

3    photo.

4            And I've -- again, I'm an officer of the Court and

5    a representative of the State Department.  I've written to

6    Mr. Batista and guaranteed that the State Department will

7    issue a passport upon the receipt of those two items and

8    that the letter of no record will remain in her file forever

9    and this will not -- this issue will not arise again.

10            THE COURT:  Anything further for State, sir?

11            MR. DUFFEY:  Let's see.

12            On the issue of mootness, I think the case is *FBI*

13    *versus Fikre*.

14            THE COURT:  Yes.  Yes.  Thanks for bringing that

15    up.  Why don't you respond to Mr. Batista's arguments on

16    that.

17            MR. DUFFEY:  There, the facts there are totally

18    different.  There, the Government put Mr. Fikre on the No

19    Fly List in violation of his constitutional rights.

20            They were asking him to become an informant on

21    persons in his mosque.  So the Government was definitely

22    there doing something that it appeared it shouldn't have.

23    So it issued a declaration taking him off the No Fly List.

24    But it said him being taken off the No Fly List was based on

25    currently available information, and they don't anticipate

1     him being put on the No Fly List again.

2           But this didn't satisfy the voluntary cessation

3     requirement because they were obviously leaving open the

4     possibility that he could be put on the No Fly List again.

5           This case is totally different.  First, there was

6     no illegal conduct.  The Department was justified in

7     requesting a letter of no record.

8           THE COURT:  And is that a relevant factor for that

9     prong?  Do I consider whether or not there was illegal

10    conduct by the Defendant?

11          MR. DUFFEY:  Yes, you do.

12          THE COURT:  Okay.

13          MR. DUFFEY:  You do.

14          Let's see.  And then *West Virginia* was -- *versus*

15    *EPA* is also inapplicable, your Honor.  That case involved a

16    2015 clean power plant rule addressing carbon dioxide

17    emissions which sought a generational shift to cleaner

18    sources, which was stayed and repealed.  And after the

19    appeals court entered judgment, the EPA planned to replace

20    it with a new rule.

21          And the Government's mootness argument in that

22    case boiled down to its representation that the EPA had no

23    present intention of enforcing the clean power plant because

24    it was in the process of promulgating a new rule.

25          And that case held that voluntary cessation does

1     not moot a case unless it is absolutely clear that the

2     alleged wrongful behavior could not reasonably be expected

3     to recur.  And there, the Government didn't meet that

4     burden.

5            Again, this case is totally different.  The

6     litigation has been resolved.  There's no further

7     infringement of the Plaintiff's religious rights or her

8     beliefs and there's no concern about a Social Security

9     number being issued.  And the Department has agreed to issue

10    her a passport.

11           Is there anything else, your Honor?

12           THE COURT:  No.  Thank you, sir.

13           MR. DUFFEY:  Thanks.

14           THE COURT:  Mr. Batista, I'll give you the last

15    word.

16           MR. BATISTA:  Thank you, your Honor.

17           First, on mootness, I heard Mr. Duffey make

18    several representations here.  For example, he represented

19    that the Department is satisfied that she meets citizenship

20    requirements, that she will not be required to submit the

21    letter of no record again.  But our fundamental point is

22    that it has given us no way to enforce those

23    representations.

24           I am not aware and Mr. Duffey has not cited any

25    authority for why those representations would bind the

1    Department, and certainly not in ten years, when her

2    passport comes up for renewal.

3              THE COURT:  Maybe I'm replowing old ground here.

4    But on the renewal point, wouldn't it be a different

5    standard?  At the renewal, they're not asking for a birth

6    certificate or a letter of no record.  Right?

7              MR. BATISTA:  Your Honor, that is what I

8    understand to be their current policy, even setting aside

9    that policy could change.

10             Again, I think it goes back to the fact that the

11   renewal effectively guarantees that her passport file will

12   be back in the Department's consideration.  I think it is

13   certainly a realistic possibility that in ten years there

14   will be different officials there.

15             And I just don't see how those future officials

16   could look back on -- if they're even aware of the legal

17   briefs in this case and determine, We are bound by those

18   representations.  I am not aware of any reason and the

19   Department has not given any for why that would be the case.

20             And, you know, the concern is about, you know,

21   Mr. Duffey said she won't be required to submit a letter of

22   no record again because we have it; it's in our file.

23             The concern, I think, principally is about the

24   Department deeming this current letter of no record

25   inadequate for any number of reasons because, for example,

1    the Department determines that it should have been provided

2    by her or that it is too old.  Any number of other reasons.

3            In our fundamental submission, the Department has

4    consistently avoided being bound moving forward.  If

5    Mr. Duffey is serious -- and I have no reason to doubt that

6    he is -- about the representations that he is making on

7    behalf of the Department, then there is no reason why the

8    Department should have rejected a binding consent decree.

9    Yet they did.

10            As to RFRA, your Honor, the Virginia code

11    provision that your Honor was referencing, 32.1-272-D, which

12    does allow the Virginia officials to respond to information

13    requests from the Department, I think that that crystallizes

14    why it wasn't Virginia that was imposing, you know, some

15    obstacle that the Department can offload its obligations to.

16    Virginia law gave the Department a clear, less restrictive

17    means here, even setting aside all the evidence of

18    citizenship that she submitted.

19            I would also note that after -- as your Honor

20    referenced, after we came into the litigation and brought

21    Virginia into the case, we reached out to them to at minimum

22    clarify their position regarding why it could not issue

23    Mrs. Jordan the letter of no record.

24            And Virginia's response to me, which is reflected

25    in my own declaration in the record, was, Well, we have this

partial birth certificate that we think might be hers.  And

so the only thing that we can give her is a completed birth

certificate.

I think that just crystallizes the reasonableness

of her fear back in 2019 that applying for this letter of no

record could have resulted in some sort of birth certificate

for her and in turn a Social Security number.

I think lastly, your Honor, regarding the letter

of no record:  First of all, the notion -- it is simply

wrong that the ancestry.com search result at Page 10 of the

administrative record could have in any way cast any doubt

on citizenship or credibility.

It fully corroborated everything that Mrs. Jordan

told the Department at Page 4 of the administrative record

and her April 4th, 2019, letter and declaration that "my

parents did not -- deliberately did not seek a birth

certificate for me and did not give my name to the

hospital."  That is the only conceivable reason why this

search result, if it even did pertain to her, would say:

Name:  Baby Girl Carmichael, not Abigail Carmichael.

And furthermore, it also could not have cast any

doubt on her citizenship, again going back to where I

started:  all the evidence of citizenship that she did

submit.  She never asked the Department for some sort of

extraordinary exception.  She gave the Department abundant

 1    evidence of her birth in Virginia.

 2              And to conclude, that goes back to, I think, what

 3    Mr. Duffey started with, that -- the notion that this case

 4    could be easily over.  It could have been very quickly over

 5    and we would never have gotten here if the Department had

 6    simply credited the evidence of citizenship that Mrs. Jordan

 7    submitted six years ago and supplemented in her 2022

 8    applications.

 9              Thank you.

10              THE COURT:  Thank you, Mr. Batista.

11              Thanks to both sides for your thoughtful briefing

12    and arguments here.

13              And especially thanks to Mr. Batista and your team

14    for taking this case on *pro bono*.

15              I will take the matter under advisement and be

16    back with you all in due course.

17              Thanks, folks.

18              (Proceedings concluded.)

19

20

21

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3                I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10               Dated this 28th day of July, 2025.

11

12          <u>/s/ Lisa Edwards, RDR, CRR</u>
            Official Court Reporter
13          United States District Court for the
              District of Columbia
14          333 Constitution Avenue, Northwest
            Washington, D.C. 20001
15          (202) 354-3269

16

17

18

19

20

21

22

23

24

25